Patrick Q. Hall (CA Bar No. 97019)
SELTZER CAPLAN McMAHON VITEK
A Law Corporation
750 B Street, 2100 Symphony Towers
San Diego, California 92101
Telephone:  (619) 685-3066
Facsimile: (619) 297-1150
hall@scmv.com

Attorneys for Defendant
JESUS QUINONEZ-MARQUEZ

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

(Hon. William Q. Hayes)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JESUS QUINONEZ MARQUEZ (10),<br><br>Defendant. | CASE NO. 10-CR-3044-10-WQH<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE DERIVED FROM WIRETAPS AS EXCEEDING THE JURISDICTION OF THE AUTHORIZING COURT AND TITLE III.** |

### I.
### INTRODUCTION

Pursuant to the wiretaps in this case, the monitoring agents intercepted communications by Mr. QUINONEZ, while he was using a cell phone in Mexico.  The communications were not directed to anyone in the United States or even directed to or from a telephone located in the United States, but rather occurred between participants who were in Mexico for the entire duration of the conversations.  Rather than minimizing the calls due to a lack of jurisdiction, the agents recorded the calls and used them to obtain the arrest warrant for Mr. QUINONEZ.

Notwithstanding the advances in technology which allowed the interception of conversations between persons using telephones located in Mexico, Title III quite simply does

not authorize such interceptions. The agents should not have intercepted these communications because the interception was outside the scope of the Court's Order authorizing the wiretaps, as well as the jurisdiction conferred by Title III. Accordingly, all evidence of calls occurring between participants communicating entirely in Mexico should be suppressed at trial. At the very least, because it appears that the court was misled about the nature of the intended interceptions, Mr. QUINONEZ seeks an evidentiary hearing pursuant to the holding in <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

## II.
## <u>STATEMENT OF FACTS</u>

On March 5, 2010, Assistant United States Attorney Todd W. Robinson applied to the court for an order allowing the interception of wire communications to and from a number of Target Telephones. The Application further sought an order directing "any other provider of wire communications services as defined in Section 2510(15) of Title 18, United States Code" to furnish "***information, facilities and technical assistance necessary to accomplish the interceptions***…" (Wiretap Application filed 3/5/10, Exhibit A, p 9, lines 10-12) (emphasis added).

In addition, the Application also sought the installation of a pen register and trap and trace device for up to 60 days. In that Application, the court was told: "***The geographic area of the trap and trace device shall be limited to the United States of America***." (Wiretap Application filed 3/5/10, Exhibit A, p 10, lines 8-9).

Finally, the Application requested: "…that in the event that any of the above-noted **Target Telephones**, or any of the **various and changing cellular telephones** used by Mario ESCAMILLA during the period of authorization, are transferred outside the territorial jurisdiction of this Court, that interceptions may take place in any other jurisdiction **within the United States.**" (Wiretap Application filed 3/5/10, Exhibit A, p. 11, lines 1-5).

The court is not told that the affiant or applicant anticipated intercepting calls occurring entirely between two telephones located in Mexico. Nor is the court told that the wiretap would be used to trap and trace telephones located in Mexico.

The Order authorizing this first wiretap provided:

"IT IS FURTHER ORDERED, pursuant to Title 18, United States Code, Section 2518(3), that in the event that any of the above-noted **Target Telephones,** or any of the **various and changing cellular telephones** used by Mario ESCAMILLA during the authorized period of interception, are transferred outside the territorial jurisdiction of this Court, that interceptions may take place in any other jurisdiction within the United States." (Order 3/5/10, Exhibit C, pages 7-8, lines 24-28 and 1-2).

That same order authorized the installation of a trap and trace device.  In so doing, the court also limited its use to the territorial United States:  "The geographic area of the trap and tace device shall be limited to the United States of America."  (Order 3/5/10, Exhibit C, page 8, lines 17-18).

Importantly, the court ordered:

"IT IS FURTHER ORDERED that this Order shall be executed as soon as practicable after it is signed and that all monitoring of wire communications shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under Chapter 119 of Title 18, United States Code." (Order 3/5/10, Exhibit C, page 9, lines 20-23).

The subsequent applications and orders contain similar if not identical language. Notwithstanding the limitations set forth in the order, the agents monitoring the wiretap intercepted numerous conversations not authorized to be intercepted by Title III.   Mr. QUINONEZ seeks an evidentiary hearing to establish the very significant number of calls where all participants were physically located in Mexico.

### III.
### MR. QUINONEZ HAS STANDING TO CHALLENGE THE WIRETAP BECAUSE HE WAS A PARTY TO INTERCEPTED CALLS AND A TARGET OF THE WIRETAPS.

Federal law provides a remedy for those defendants whose communications have been unlawfully intercepted (e.g. intercepted without proper judicial approval):  "If wiretap

3

information is gathered in violation of the safeguards of [federal wiretap law], any aggrieved person may move to suppress the contents of any intercepted communication, or evidence derived therefrom, sought to be used against him or her in any state or federal proceeding." United States v. Angulo-Hurtado, 165 F. Supp.2d 1363, 1368 (N.D. Ga. 2001).

The statutory authority for such an exclusionary procedure comes from Title 18 U.S.C. § 2518(10)(a):

> Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—
> (i) the communication was unlawfully intercepted;
> (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
> (iii) the interception was not made in conformity with the order of authorization or approval.

Title 18 U.S.C. §2518(11) defines an aggrieved person as one "who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."

Here, Mr. QUINONEZ' telephone conversations in Mexico were first intercepted on March 6, 2010, at 1:31 p.m. pursuant to the March 5, 2010 application and order.  Some of the other conversations intercepted pursuant to that wiretap are identified in a later wiretap application affidavit. (Affidavit in Support of 5/24/10 Application, Exhibits K 1 and K 2) Accordingly, Mr. QUINONEZ has standing to challenge the lawfulness of that March 5, 2010 wiretap.

In addition, after that, Mr. QUINONEZ was referenced as a target, "FNU LNU aka Rinon" in the April 23, 2010 application, (Application for Wiretap Dated 4/23/10, Exhibit D, page 4, line 28) and the May 11, 2010 application, (Application for Wiretap Dated 5/11/10, Exhibit G, page 3, line 15).   He was also intercepted making and receiving calls in Mexico pursuant to these wiretaps.

On May 21, 2010, the Government also applied for a wiretap on a cell phone, which the Government specifically alleged belonged to Mr. QUINONEZ.   During the execution of that wiretap, he was intercepted receiving and making telephone calls in Mexico.  The May 27, 2010, wiretap application identified him as a target as well as the June 17, 2010, and June 23, 2010, and July 15, 2010 applications.  Accordingly, as both a party to many of the intercepted calls at issue here and a target of the interceptions, he is an "aggrieved person" within the meaning of Title III and has standing to challenge these wiretaps.

**IV.**
**TITLE III DOES NOT AUTHORIZE THE INTERCEPTION OF COMMUNICATIONS OCCURRING ENTIRELY IN A FOREIGN COUNTRY.**

Title III sets forth the jurisdictional limits of an order to intercept communications, provides the scope of the communications that can be lawfully intercepted with a wiretap, and delineates the procedure for obtaining such a wiretap:

> Upon application [a] judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire, oral, or electronic communications <u>within the territorial jurisdiction of the court in which the judge is sitting</u> (<u>and outside that jurisdiction but within the United States in the case of a mobile interception device authorized by a Federal court within such jurisdiction</u>), if the judge determines on the basis of the facts submitted by the applicant that . . . [1]

18 U.S.C. § 2518(3) [emphasis added].

"For jurisdictional purposes the question is where the interception occurred."  <u>United States v. Burford</u>, 755 F.Supp. 607, 610 (S.D.N.Y 1991); <u>United States v. Luong</u>, 471 F.3d 1107, 1109 (9th Cir. 2006).

"'[I]ntercept[ion]' means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C.A. § 2510.

---

[1]  A "mobile interception device" is defined as "a device for intercepting mobile communications . . . ." <u>United States v. Ramirez,</u> 112 F. 3d 849, 853 (7th Cir. 1997)

"This definition does not state where an interception occurs or whether more than one interception point may exist for jurisdictional purposes."  United States v. Luong, supra, 471 F.3d at 1109.  The Ninth Circuit, following at least three other circuits, has held "[t]he most reasonable interpretation of the statutory definition of interception is that an interception occurs where the tapped phone is located and where law enforcement officers first overhear the call." Ibid.

In Luong, a judge in the Northern District of California issued an order authorizing the interception of communications to and from a mobile phone with a (916) area code.  Id. at 1108.  All landline telephones with a 916 area code were within the Eastern District of California.  The affidavit accompanying the application for the wiretap order stated that "'all of the intercepted conversations would 'first be heard in the Northern District of California' and interception 'will automatically take place in San Francisco, California, regardless of where the telephone calls are placed to or from.'"  Id. at 1109.  In upholding the jurisdiction of the court to issue the wiretap, the court found persuasive the reasoning of the Second Circuit in the oft-cited case of United States v. Rodriguez, 968 F.2d 130, 136 (2nd Cir. 1992):

> It seems clear that when the contents of a wire communication are captured or redirected in any way, an interception occurs at that time. Such an interception plainly occurs at or near the situs of the telephone itself, for the contents of the conversation ... are transmitted in one additional direction. Redirection presupposes interception....
>
> Nonetheless, since the definition of interception includes the "aural" acquisition of the contents of the communication, the interception must also be considered to occur at the place where the redirected contents are first heard.
>
> United States v. Luong, supra, 471 F.3d at 1109.

Importantly, the court held that the area code of the phone being wiretapped was irrelevant to its analysis: "The district court accordingly had jurisdiction to authorize the wiretap of Luong's mobile telephone despite the phone's Eastern District area code. Agent Lee's affidavit explained that all of the intercepted conversations would "first be heard" at a

listening post "in San Francisco, California, regardless of where the telephone calls are placed to or from." Ibid.

At issue in Rodriguez was whether a federal judge in New York had jurisdiction to authorize the wiretap of a phone located in New Jersey—outside the territorial jurisdiction of the New York federal court. Id. at 134, 136. The court acknowledged that "an interception plainly occurs at or near the situs of the telephone itself . . . [and] [a]ccordingly, a federal court sitting in the jurisdiction in which the to-be-tapped telephone is located would have the authority, under § 2518(3), to authorize a wiretap." Id. at 136. At the same time, however, the court noted that "interception" also occurs at an alternative location:

> [S]ince the definition of interception includes the "aural" acquisition of the contents of the communication, the interception must also be considered to occur at the place where the redirected contents are first heard. See Webster's New International Dictionary, at 182 (2d ed. unabridged 1957) (defining "aural" as "of or pertaining to the ear or the sense of hearing"). Indeed, prior to 1986, [federal wiretap law's] definition of interception focused on "aural acquisition[s]" alone . . . In sum, the language of § 2510(4), the legislative history of that section, and the policy considerations of [federal wiretap law] all persuade us that for purposes of § 2518(3)'s jurisdictional requirement, a communication is intercepted not only where the tapped telephone is located, but also where the contents of the redirected communication are first to be heard.

> Ibid. [emphasis added].

Because the communications were heard in New York, the court held that the wiretaps were lawful. Ibid.

Taken to its logical conclusion, federal Circuits adopting the "location of interception" rule have jurisdiction to issue orders intercepting communications anywhere in the world so long as the redirected communications are first "heard" by law enforcement officials in the issuing judge's district. Under this view, a court's jurisdiction to issue a wiretap is potentially boundless, especially considering today's advances in technology. Apparently, this is exactly what the United States Attorney's Office believed when it applied for the wiretaps at issue

here.  (See Wiretap Application filed 5/24/10, Exhibit J, p 8, lines 8-10 ["…that in the event that any of the above-noted **Target Telephone** (sic) is transferred outside the territorial jurisdiction of this Court, that interceptions may take place in any other jurisdiction within the United States"].)

The <u>Rodriguez</u> case, however, does not end the inquiry for it did not consider—nor have any of its progeny considered—application of the rule when the communications to be intercepted occur entirely in another country.  As is demonstrated below, this is not the law and a United States court does not have the jurisdiction to issue an order to surreptitiously intercept foreign communications under Title III.

A basic canon of the construction of federal statutes is that, "unless a contrary intent appears, federal statutes apply only within the territorial jurisdiction of the United States." <u>United States v. Cotrini</u>, 527 F.2d 708, 711 (2d Cir. 1975).  In a line of cases, largely based on the challenge to authorization of wiretaps by <u>foreign authorities</u> (and not, as here, the jurisdiction of a <u>United States</u> court to order the interception of communications occurring in a foreign country), Courts interpreting whether federal wiretap law applies outside of the United States have emphatically and uniformly held that "Title III has no extraterritorial force."  <u>Id</u>.; <u>United States v. Peterson</u>, 812 F. 2d 486, 492 (9th Cir. 1987).

In <u>United States v. Angulo-Hurtado</u>, 165 F. Supp.2d 1363, 1368 (N.D. Ga. 2001), federal agents utilized communications uncovered pursuant to an allegedly unlawful wiretap <u>authorized by Colombian authorities</u> as evidentiary support in the agents' declaration for their own separate United States wiretap. <u>Id</u>. at 1366-67.  Although the facts in <u>Angulo-Hurtado</u> are plainly different from those presented here, language used by the court in reaching its decision is instructive.  In reaching its decision, the court noted that American wiretap law does not include any "<u>provision for obtaining authorization for a wiretap in a foreign country</u>."  <u>Id</u>. at 1369 [emphasis added][citations omitted].  Accordingly, a federal judge lacks the authority to wiretap a foreign phone.  See <u>United States v. Angulo-Hurtado</u>, <u>supra</u>, 165 F. Supp. 2d 1363, 1369.

In stark contrast to the situation presented here, namely, a United States court authorizing the interception of communications occurring entirely in a foreign country, the Angulo-Hurtado court recognized that even with participation of the United States in the Columbian wiretap, there was no basis for the application of Title III standards to a wiretap authorized by foreign authorities:

> Defendants having presented no argument or authority to the contrary, this Court is persuaded by the rationale of Toscanino and Cotroni. As these cases explain, Congress intended Title III to protect the integrity of United States communications systems against unauthorized interceptions taking place in the United States. If Congress had meant to require law enforcement agencies to satisfy Title III for interceptions conducted outside the United States, it would have provided some mechanism by which agents could obtain such approval. Congress did not do so. Therefore, even if United States participation in the Colombia wiretap were so extensive that the wiretap must be viewed as an operation of the United States (rather than Colombian) Government, which is by no means clear, Defendants have provided no basis upon which the Court could conclude that Title III standards applied. Accordingly, to the extent that Defendants' "fruit of the poisonous tree" argument rests on the purported illegality of the Colombian wiretap under Title III, that contention has no merit.

> United States v. Angulo-Hurtado, supra, 165 F. Supp. 2d at 1369 [emphasis added].

This same principle—a federal judge technically lacks the authority to issue a foreign wiretap—is again applied to a defendant's challenge to a wiretap conducted by foreign law enforcement in the oft-cited Second Circuit case, United States v. Toscanino, 500 F. 2d 267, 279 (2d. Cir. 1974). In Toscanino, federal government officials allegedly bribed a Uruguayan official to conduct electronic surveillance on a foreign citizen in Uruguay, and requested that the Uruguayan official forward the results of the surveillance to federal authorities in the United States. Id. at 270. After being arrested, the defendant contended that the United States government violated federal wiretap law as a result of its unlawful surveillance in contravention of Title III. Id. at 279.

The court disagreed with the defendant and held that no violation of federal wiretap law occurred.  Id. at 279-280.  The court explained that a federal judge did not have power to authorize a wiretap on a phone in Uruguay, and thus no violation of federal statutory law was possible:  "In prescribing the procedures to be followed in obtaining a wiretap authorization, see 18 U.S.C. § 2518, the statute significantly makes no provision for obtaining authorization for a wiretap in a foreign country."  Id. at 279-280 [emphasis added].  The court explained that an extraterritorial wiretap was not possible due to the fact that "wire communications" constitute only those communications taking place on American soil:  "The term 'wire communication,' as used in the statute, 18 U.S.C. 2510(1), is intended to refer to communications 'through our Nation's communications network.'"  Id. at 279; See 1968 U.S. Code Cong. & Admin. News, 90th Cong., 2d Sess. p. 2178.  Because nothing in the statutory framework prohibited the extraterritorial interception of communications by foreign authorities, the court held that United States officials did not violate federal wiretap law when they bribed the local Uruguayan employee to conduct electronic surveillance on the defendant in Uruguay, and forward that surveillance to government officials in the United States.  Id. at 279-280.

United States v. Cotrini, 527 F.2d 708 (2d Cir. 1975), again involving a wiretap conducted by foreign law enforcement authorities, reiterated the rule stated in Toscanino by refusing to apply Title III to a foreign wiretap.  In Cotrini, Canadian law enforcement, without judicial authorization as required under Title III, placed wiretaps at the home and social club of the defendant.  Cotrini, supra, 527 F.2d at 710.  In a prosecution in the Eastern District of New York, evidence obtained as a result of these wiretaps was used to convict the defendants. Cotrini argued, *inter alia*, that Title III proscribed the introduction of the evidence because "the intercepted telephone conversations traveled in part over our country's communication system."  Id. at 711.  According to the court, the mere fact that the communications had traveled over communications networks located within the United States did not inform the analysis:

The District Judge also held that, although the intercepted telephone conversations traveled in part over our country's communication system, their introduction into evidence was not proscribed by Title III. In so doing, he relied largely on our decision in United States v. Toscanino, 500 F.2d 267, 279 (2d Cir. 1974), where we said that 'the federal statute governing wiretapping and eavesdropping, 18 U.S.C. s 2510, et seq., has no application outside of the United States.' Appellants would distinguish Toscanino because of the partial use in the instant case of United States communication facilities, relying for this argument on the definition of 'wire communication' contained in 18 U.S.C. § 2510(1). We think this reliance is misplaced. Congress sought by Title III to regulate interceptions, not wire communications. See Act of June 19, 1968, P.L. 90-351, s 801(a)-(d), 82 Stat. 211. Thus, it is not the route followed by foreign communications which determines the application of Title III; it is where the interception took place. Section 2511 prohibits the willful interception of communications and the willful disclosure of the contents of communications wrongfully intercepted. The former triggers the latter and forms the entire basis for the evidentiary rule of exclusion found in 18 U.S.C. § 2515.

Our holding in Toscanino comports with the canon of construction which teaches that, unless a contrary intent appears, federal statutes apply only within the territorial jurisdiction of the United States. Foley Brothers v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949); Air-Line Stewards and Stewardesses Association International v. Trans World Airlines, Inc., 273 F.2d 69, 70 (2d Cir. 1959) (per curiam), cert. denied, 362 U.S. 988, 80 S.Ct. 1075, 4 L.Ed.2d 1021 (1960).

United States v. Cotroni, supra, 527 F.2d at 711.

Disregarding the blanket proposition that a judge has jurisdiction to authorize the interception of communications redirected and "intercepted" in the United States, no matter where the communication takes place (an issue not considered by any of the courts announcing the rule), under Cotroni, the mere fact that the communications at issue here may have traveled over a United States communication network does not inform the analysis.  "'[T]he federal statute governing wiretapping and eavesdropping, 18 U.S.C. § 2510, et seq., has no application outside of the United States.'"  Id.  The fact that the communications at issue may have traveled over a communications network in the United States does not create jurisdiction where

there was none—"18 U.S.C. § 2518 . . . <u>makes no provision for obtaining authorization for a wiretap in a foreign country</u>."  <u>Toscanino</u>. 500 F.2d at 279-280 [emphasis added].[2]

In <u>United States v. Romano</u>, 706 F.2d 370 (2nd Cir. 1983), again different from the case at bar, the defendants, Italian citizens, were prosecuted in the Eastern District of New York and tape-recordings of conversations between an informant—who gave consent to the taping—located in New York and the defendants, in Italy, was presented to the grand jury.  (<u>Id</u>. at 376.) In rejecting the defendant's argument, the court reasoned that because the taping was done with the consent of one of the parties to the communication, under Title III, the wiretap was lawful:

> Since the recording of appellants' conversations with Nohra took place within the United States, questions of illegality under Italian law are immaterial. "[I]t is not the route followed by foreign communications which determines the [applicable law]; it is where the interception took place." <u>United States v. Cotroni</u>, 527 F.2d 708, 711 (2d Cir.1975). The interception here complained of took place in the United States, and, therefore, it is the law of the United States concerning the legality of wiretaps which is controlling. It cannot be contested that the taping, done with the consent of one of the parties, Nohra, was lawful, and consequently admissible as evidence in a criminal trial under United States law. 18 U.S.C. § 2511(2)(c) & (d); <u>United States v. Mendoza</u>, 574 F.2d 1373, 1377 (5th Cir.), reh'g denied, 579 F.2d 644, cert. denied, 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978); <u>United States v. Wright</u>, 573 F.2d 681, 684 (1st Cir.), cert. denied, 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978); <u>United States v. Proctor</u>, 526 F.Supp. 1198, 1201 (D.C.Hawaii 1981). See also <u>United States v. White</u>, 401 U.S. 745, 749, 91 S.Ct. 1122, 1124, 28 L.Ed.2d 453 (1971).

> <u>United States v. Romano</u>, 706 F.2d 370, 376 (2d Cir. 1983)

Assuming arguendo that the "interception" took place in the United States where the recording of the communications took place, United States law applies to the interception.  <u>Id</u>.

---

[2] See also <u>United States v. Tirinkian</u>, 502 F.Supp. 620 (D.N.D. 1980) [Title III had no application to wiretaps obtained by Austrian and Canadian authorities to intercept communications between phones located in Canada and Austria].

Following <u>Toscanino</u>, however, a United States court has no jurisdiction to issue a wiretap to cover communications occurring in foreign countries.

In <u>United States v. Harvey</u>, 560 F. Supp. 1040, 1058-59 (S.D. Fla. 1982) aff'd sub nom. <u>United States v. Van Horn</u>, 789 F.2d 1492 (11th Cir. 1986), a judge in the Southern District of Florida issued an extension of a wiretap order operative within his own district, although the judge executed it in another district of Florida while attending a seminar.  <u>Id</u>.  The defendant challenged the extension of the wiretap on the grounds that the judge did not have jurisdiction to issue the extension under Title III because he was outside the Southern District when he signed the extension.  Id.  Although the same issue is not presented by the case at bar, in reaching its conclusion that the extension was valid, the court examined the authority of a judge to issue an order outside of its jurisdiction, generally, and reasoned:

> When reviewing judicial authority under 18 U.S.C. § 2518, an examination of the authority provided to judges/magistrates to issue search warrants under Rule 41, Fed.R.Crim.P., is relevant. The similarity between the wiretap statute and the rule governing search warrants is obvious. Both provisions require that government applications be made to judicial officers and be supported by sworn testimony or affidavits. Compare, 18 U.S.C. § 2518(1) and Rule 41(c)(1), Fed.R.Crim.P. Likewise, an order or search warrant must meet the constitutional mandates of probable cause and particularity as reflected in <u>United States v. Donovan</u>, 429 U.S. 413, 427-28, 97 S.Ct. 658, 667-668, 50 L.Ed.2d 652 (1977); <u>see also</u>, 18 U.S.C. § 2518(3) and (4) and Rule 41(c), Fed.R.Crim.P. Finally, Congress intended that 18 U.S.C. § 2518 be interpreted in light of existing law under Rule 41. S.Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S.Code Cong. & Ad.News 2112, 2189. This analogous treatment of wiretap applications and search warrants provides the basis for allowing federal judges while physically outside their territorial jurisdiction to authorize wiretap extensions which will be executed within the territorial district of the judge.

The court continued:

> The specific issue of a federal magistrate's authority to sign a search warrant outside his territorial jurisdiction was addressed in <u>United States v. Strother</u>, 578 F.2d 397 (D.C.Cir.1978). The court noted that "[j]udges have proverbially signed papers or done other

> acts outside their territorial jurisdiction which have effect-and can only have effect-within those respective jurisdictions." Id. at 400. In interpreting the language of Rule 41(a), the court focused its attention not on the physical location of the judge when signing an order but on the judge's authority where the order will be executed. The court stated that "... the search warrant can only be operative in the territory in respect of which the issuing officer is clothed with judicial authority. It is not intended, we believe, to require that under all circumstances the physical acts involved in the issuance of a warrant be performed in that territory." Id. at 399 (footnote omitted); See also United States v. Gomez, 495 F.Supp. 992, 1012 (S.D.N.Y.1979), cert. denied, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981).
>
> United States v. Harvey, supra, 560 F. Supp. at 1058-59 [emphasis added].

The reasoning of the Harvey court supports the proposition that a judge sitting in a United States court is clothed with no judicial authority to order the surreptitious monitoring and interception of communications between telephones located entirely in a foreign country. United States v. Toscanino, supra, 500 F. 2d at 279 ["the statute significantly makes no provision for obtaining authorization for a wiretap in a foreign country"]; United States v. Angulo-Hurtado, supra, 165 F. Supp.2d at 1368 ["If Congress had meant to require law enforcement agencies to satisfy Title III for interceptions conducted outside the United States, it would have provided some mechanism by which agents could obtain such approval. Congress did not do so"]; United States v. Cotrini, supra, 527 F.2d at 711 ["Our holding in Toscanino comports with the canon of construction which teaches that, unless a contrary intent appears, federal statutes apply only within the territorial jurisdiction of the United States"].

**A.** **INTERPRETING TITLE III TO ALLOW FOR THE INTERCEPTION OF COMMUNICATIONS OCCURRING IN A FOREIGN COUNTRY WOULD MAKE THE PROVISIONS OF THE FOREIGN INTELLIGENCE SERVICES ACT, 50 U.S.C. § 1801, ET SEQ., A NULLITY**

Congress has expressly legislated in the area of foreign intelligence gathering; however, none of those provisions appear in Title III. See Foreign Intelligence Services Act ("FISA"), 50 U.S.C § 1801, et seq.   FISA sets forth the procedures for the surveillance, both physical

and electronic, and the gathering of "foreign intelligence information" of foreign powers or agents of foreign powers.  Id.  The act, limited to foreign intelligence gathering, applies to:

> information that relates to, and if concerning a United States person is necessary to, the ability of the United States to protect against—
>
> (A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;
>
> (B) sabotage, international terrorism, or the international proliferation of weapons of mass destruction by a foreign power or an agent of a foreign power; or
>
> (C) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power; or
>
> (2) information with respect to a foreign power or foreign territory that relates to, and if concerning a United States person is necessary to—
>
> (A) the national defense or the security of the United States; or
>
> (B) the conduct of the foreign affairs of the United States.
>
> 50 U.S.C.A. § 1801.

The act, as originally enacted, "establish[ed] procedures under which federal officials could obtain authorization to conduct electronic surveillance for foreign intelligence purposes, including surveillance of communications between persons located within the United States and surveillance of communications between persons located within the United States and persons located outside the United States."  Amnesty Int'l USA v. Clapper, 638 F.3d 118, 122 (2d Cir. 2011).   FISA's original reach was limited to domestic searches—FISA did not "addresses[] the particular difficulties attendant to *overseas* foreign intelligence collection. In fact, as mentioned previously, it was precisely these peculiarities which caused Congress to restrain the reach of FISA to domestic searches."[3]  United States v. Bin Laden, 126 F. Supp. 2d

---

[3]  The warrantless collection of foreign intelligence in a foreign country "has been an established practice of the Executive Branch for decades[]" and is a recognized exception to the judicial oversight of searches.  See United States v. Bin Laden, supra, 126 F. Supp. 2d at 274.

264, 274 [emphasis in original] (S.D.N.Y. 2000) aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 157 (2d Cir. 2008).

In 2008, FISA was amended to create "new procedures for the authorization of foreign intelligence electronic surveillance targeting non-United States persons located outside the United States." Id.; See see also 154 Cong. Rec. S227, 228 (daily ed. Jan. 24, 2008) (statement of Sen. Rockefeller)["[W]e wanted to ensure that activities authorized by this bill are only directed at persons outside the United States.... For individuals inside the United States, the existing procedures under FISA continue to apply."][emphasis added].  As the Amnesty Intern. USA court put it:

> In practice, these new authorization procedures mean that surveillance orders can be significantly broader under the FAA[FISA Amendments] than they previously could have been. Prior to the FAA, surveillance orders could only authorize the government to monitor specific individuals or facilities. Under the FAA, by contrast, the plaintiffs allege that an acquisition order could seek, for example, '[a]ll telephone and e-mail communications to and from countries of foreign policy interest— for example, Russia, Venezuela, or Israel—including communications made to and from U.S. citizens and residents.' Moreover, the specific showing of probable cause previously required, and the requirement of judicial review of that showing, have been eliminated.

> Amnesty Int'l USA v. Clapper, supra, 638 F.3d at 126.

In contrast to the preexisting FISA scheme, as amended, FISA "does not require the government to submit an individualized application to the [Foreign Intelligence Surveillance Court] identifying the particular targets or facilities to be monitored. Instead, the Attorney General ("AG") and Director of National Intelligence ("DNI") apply for a mass surveillance authorization by submitting to the [Foreign Intelligence Surveillance Court] a written certification and supporting affidavits attesting generally that "a significant purpose of the acquisition is to obtain foreign intelligence information" and that information will be obtained "from or with the assistance of an electronic communication service provider." Id. at 124, citing 50 U.S.C. § 1881a(g)(2)(A)(v), (vi).

As the above discussion makes clear, Congress enacted a legislative scheme covering the surveillance of individuals located outside of the United States by law enforcement and has limited its application to the gathering of foreign intelligence ostensibly impacting national security.  See, generally, 50 U.S.C. §§ 1801, 1881.

Not a single section dealing with surveillance—electronic or otherwise—of individuals in a foreign country appears in Title III.  See, generally, 18 U.S.C. § 2510 et seq.  Any interpretation of Title III which sanctions the authority of a judge to issue a wiretap order intercepting communications occurring entirely in another country would be an improper and unconstitutional intrusion into the legislative power conferred on Congress by the United States Constitution.  Moreover, such a construction would require the court to ignore a fundamental canon of federal statutory construction:  "unless a contrary intent appears, federal statutes apply only within the territorial jurisdiction of the United States."  United States v. Cotroni, supra, 527 F.2d at 711.  Unlike FISA, as amended, Title III contains no provision granting a judge, or law enforcement, jurisdiction to conduct surveillance of communications in a foreign country.

It may also be inferred that when Congress amended FISA, to clearly allow foreign intelligence gathering, it easily could have amended Title III at that same time to extend wiretaps to foreign countries.  The failure to make any such amendments implies that Congress did not originally, and still does not intend for Title III to authorize wiretaps in a foreign country.

# V.
# THE DEFENSE IS ENTITLED TO AN EVIDENTIARY HEARING ON WHETHER THE COURT WAS MISLED BY THE APPLICATIONS' FAILURE TO DISCLOSE THAT THE WIRETAPS WOULD BE USED TO MONITOR CONVERSATIONS OCCURING BETWEEN PHONES LOCATED IN MEXICO.

An application for a wiretap order is required to be accompanied by a full and complete statement of the facts and circumstance relied upon by the applicant to justify belief that a

wiretap order is necessary.   18 U.S.C. §2518(1)(b) [emphasis added]. This includes "a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted." Id.

"The burden of proof is on the defendant to establish the illegality of the wiretaps by a preponderance of the evidence." United States v. Van Horn, 579 F.Supp. 804, 811 (D. Neb. 1984) aff'd sub nom. United States v. Womochil 778 F.2d 1311 (8th Cir. 1985) [citing Nardone v. United States, 308 U.S. 338, 341 (1939); United States v. Evans, 572 F.2d 455, 486 (5th Cir. 1978) ("the burden is on the movant to make specific factual allegations of illegality, to produce evidence, and to persuade the Court that the evidence should be suppressed"); see also United States v. Phillips, 540 F.2d 319, 325-6 (8th Cir.), cert. denied, 429 U.S. 1000 (1976)].

"A defendant is entitled to a [Franks] hearing if he makes a substantial preliminary showing that a false statement was deliberately or recklessly included in an affidavit submitted in support of a wiretap order, and the false statement was material to the district court's finding of necessity." United States v. Callum, 410 F.3d 571, 578 (9th Cir. 2005).

In United States v. Lefkowitz, 618 F.2d 1313 (9th Cir. 1980), the Ninth Circuit also discussed the situation where an affidavit omits material facts intentionally. There, the defendant challenged the search warrant affidavit on the grounds that it failed to indicate the identity of the informant as that of defendant's estranged wife.  The court stated:

> We assume, without deciding, that the Franks rationale also permits an attack on search warrant obtained by affidavits marred by omission of fact required to prevent technically true statements in affidavit from being misleading.

> United States v. Lefkowitz, supra, fn.3 at page 1317.

In challenging a warrant based on an affidavit marred by omissions, the defendant bears the burden of showing that there were omissions, and that they were material. The fact is material if its omission would make the affidavit substantially misleading. That is, the omission is material if there is a substantial probability that its inclusion would have altered a reasonable magistrate's probable cause determination.  Even a deliberate or reckless omission

by a government official who is <u>not</u> the affiant can be the basis for a <u>Franks</u> motion as well. <u>United States v. De Leon</u>, 979 F.2d 761 (9th Cir. 1992); <u>United States v. Calisto</u>, 838 F.2d 711 (3d Cir. 1988); <u>United States v. Pritchard</u>, 745 F.2d 1112 (7th Cir. 1984).

Here, the failure of any law enforcement official to inform the court that all, or substantially all, of the intercepted calls allegedly setting forth probable cause for the wiretap of Mr. QUINONEZ' communications were between phones located in Mexico, and that it intended to apply the wiretap order to intercept calls between phones located in Mexico, is an omission that amounts to a "false statement [] deliberately or recklessly included in an affidavit submitted in support of a wiretap order, and the false statement [or omission] was material to the district court's finding of necessity."  <u>United States v. Callum</u>, supra, 410 F.3d at 578.

At no point in any of the wiretap affidavits or applications was the court advised that technological advances allowed the agents monitoring the targeted phones to intercept the calls, even when the cell phones were not located within the territorial jurisdiction of the United States.  If anything, the applications and supporting affidavits implied the opposite:

- "***The geographic area of the trap and trace device shall be limited to the United States of America***." (Wiretap Application filed 5/24/10, Exhibit J, p 7, lines 17-18)

- "…that in the event that any of the above-noted **Target Telephone** (sic) is transferred outside the territorial jurisdiction of this Court, that interceptions may take place in any other jurisdiction within the United States." (Wiretap Application filed 5/24/10, Exhibit J, p 8, lines 8-10)

- "Service for **Target Telephone** #25 is provided by the Mexican branch of Sprint-Nextel and subscriber records for that telephone are not maintained by the U.S. brand of Sprint-Nextel company.  I am therefore unable to subpoena the subscriber information and/or toll records for the **Target Telephone** #25" (Wiretap Affidavit filed 5/24/10, Exhibit K 1, p 3, lines 27-28)

All of these representations imply that the cell phones could only be intercepted while in the United States or while calling a phone located in the United States.  However, this was only

a part of what was actually occurring.  In reality, the agents intercepted communications between Mr. QUINONEZ, made by him on a cell phone while he was in Mexico, and others, also physically situated in Mexico and using phones in Mexico.  The fact that the agents could intercept these calls is simply a function of the technological advances of cell phones. Undoubtedly that technology is being used to intercept communications under the amendments to FISA.  However, that does not mean that Title III authorizes such interceptions.  In fact, it appears that the interception was also in violation of Mexican law.

Nothing could be more material to the judicial officer authorizing a wiretap than whether the court had jurisdiction to wiretap a phone located entirely in another country and electronically communicating with another telephone device also located in that same country. At the very least, this material omission of fact, entitles Mr. QUINONEZ to a hearing regarding on whether the material omission affected the court's determination of jurisdiction. Franks v. Delaware, 438 U.S. 154 (1978).

## VI.
## CONCLUSION

Federal wiretap law does not authorize the interception of international communications between two phones geographically situated in a foreign country.  Accordingly, the defense seeks suppression of all evidence of intercepted calls on telephones physically located in Mexico obtained as a result of these unlawful wiretaps.  Mr. QUINONEZ seeks an evidentiary regarding the issues raised in this motion.

Respectfully Submitted,

Dated:  May 31, 2011                  SELTZER CAPLAN McMAHON VITEK
                                      A Law Corporation

                                      By:    /s/Patrick Q. Hall
                                             PATRICK Q. HALL
                                             Attorneys for Defendant
                                             JESUS QUINONEZ MARQUEZ